IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

BLANCA NIEVES-RODRIGUEZ
VICTOR NIEVES-RODRIGUEZ
Plaintiffs

vs

R. J. REYNOLDS TOBACCO COMPANY
LIGGETT AND MYERS TOBACCO COMPANY
Defendant

CIVIL 03-2037CCC

## OPINION AND ORDER

This is an action brought by the siblings of the late José L Nieves-Rodríguez against R.J. Reynolds Tobacco Company (Reynolds). Plaintiffs Blanca Nieves-Rodríguez (Blanca) and Víctor Nieves-Rodríguez (Víctor) contend that their brother's death on September 25, 2001, at the age of 65, resulted from his having smoked defendant's Winston brand cigarettes for more than forty-seven years. It is alleged that he developed an addiction due to the nicotine and other harmful ingredients contained in the cigarettes, which, in turn, caused his illnesses.

Plaintiffs bring their action under the Federal Cigarette Labeling and Advertising Act (Labeling Act), 15 U.S.C. §1331, et seq., and pursuant to our diversity jurisdiction under Article 1802 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 5141, based on various theories:

The first count claims that Reynolds is subject to strict liability, alleging that it "manufactured, sold and distributed unsafe and defective tobacco products, mainly cigarettes containing ingredients harmful to human life...." Complaint ¶35a.

The second count alleges negligence, in that defendant breached its duty of reasonable care to the decedent by failing to design, test and manufacture products that were not, or were less, addictive, that did not contain unreasonable levels of nicotine. Complaint ¶42.

CIVIL 02-2707CCC                                    2

The third count presents a failure-to-warn claim, in that the decedent did not read or understand English,[1] and the warnings should have been written in Spanish, the predominant language of Puerto Rico, where the cigarettes were sold. Complaint ¶¶44-48. No specific legal source is given for this claim.

The fourth count claims a breach of federal law under the Labeling Act, alleging that the utilization of English warnings in Puerto Rico, where the predominant language is Spanish, breached the duty imposed by 15 U.S.C. §1331, et seq. Complaint ¶¶49-53.

The fifth count purports to be for a breach of Puerto Rico law for having allegedly breach the federal law, 15 U.S.C. §1331, et seq. Complaint ¶55. We note, however, that plaintiffs do not identify any local law which creates a separate cause of action for violating a federal law.

The sixth cause of action is brought under a theory entitled consumer expectation, inarticulately alleging a claim because the cigarette products at all times pertinent hereto were unsafe to an extent beyond that which would be contemplated by the ordinary consumer who purchased them with the ordinary knowledge common to the community as to their characteristics. Complaint ¶¶57-58.

The seventh and last count alleges that the cigarettes were defectively designed and that said defects proximately caused the death of plaintiffs' decedent. Complaint¶60-61.

Before us now is Reynold's Motion for Summary Judgment (**docket entry 36**) on November 4, 2004, which plaintiffs opposed[2] on January 27,2005 (**docket entry 52**), filing their statement of facts (**docket entry 55**) and exhibits (**docket entry 56**) separately. Defendant replied (**docket entry 91**).

---

[1]Decedent did in fact, understand, read and write English, according to the witnesses.

[2]Plaintiffs opposition was untimely filed—seventeen days late—notwithstanding the grant of two extensions of over six weeks to do so. The exhibits, which were not filed with the motion, were filed six days later.

CIVIL 02-2707CCC                                3

Reynolds moves the Court to grant summary judgment in its favor for the following reasons: (1) plaintiffs' claims are time barred;[3] (2) plaintiffs' claims for failure-to-warn after 1969 are expressly preempted as a matter of law; (3) all claims sounding in either negligence or strict liability alleging that it is a tort to manufacture, advertise and sell cigarettes merely because they are harmful and "addictive," are precluded by the doctrine of conflict preemption; 4) plaintiffs have not provided any evidence to support their contention that warnings were necessary prior to 1969 because the health hazards of smoking were not commonly known, and that there is no evidence that the failure-to-warn, pre-1969, proximately caused decedent's injuries; and 5) the design defect claim falls because there is no evidence that ordinary cigarettes are defective under the consumer expectation test and/or that there is no evidence of any safer, feasible alternative design that would have prevented decedent's injuries.

## FAILURE TO WARN IN SPANISH AFTER THE LABELING ACT

Plaintiffs have provided extensive argument as to why their post-1969 failure-to-warn claims are not preempted by the Labeling Act. The matter, however, is unambiguously stated in the law and specifically reaffirmed in jurisprudence.

Congress has foreclosed the removal of tobacco products from the market. Food and Drug Administration v. Brown & Williamson Tobacco Corporation, 120 S.Ct. 1291, 1302 (2000). A provision of the United States Code currently in force states that "[t]he marketing of tobacco constitutes one of the greatest basic industries of the United States with ramifying activities which directly affect interstate and foreign commerce at every point, and stable conditions therein are necessary to the general welfare." Id. Clearly aware that the adverse health consequences of tobacco use are well known, as are nicotine's pharmacological effects, Congress has addressed the problem of cigarettes and health on six occasions since 1965. Id.

---

[3]Whether the action is time-barred may present issues of material fact which would require credibility determinations. We therefore do not address this matter as it is not determinative of our decision.

CIVIL 02-2707CCC                                   4

Congress passed the Labeling Act in July, 1965 to "adequately [inform] the public that cigarette smoking may be hazardous to health," among other things. Cippolone v. Liggett Group, 505 U.S. 504, 514 (1992). In 1969 the Act was amended to require warnings on cigarette packages to read that cigarette smoking "is hazardous" rather than the milder warning that it "may be hazardous." 15 U.S.C. §1333. At this time the Act's preemption clause, 15 U.S.C. §1334, was also expanded:

> (a) Additional statements. No statement relating to smoking and health, other than the statement required by section 4 of this Act, shall be required on any cigarette package.
>
> (b) State regulations. No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act."

The amended clause preempts all failure-to-warn claims arising after 1969 where it is alleged that the defendant "should have included additional, or more clearly stated, warnings." Cippollone, supra, at 524.

The failure-to-warn claims were initially rejected in this district in Cruz Vargas v. R.J. Reynolds Tobacco Company, 218 F.Supp.2d 109 (D.P.R. 2002), where the Court stated:

> The requirements of the Labeling Act are unambiguous. The statute provides the precise and mandatory language for cigarette pack warnings. The statute does not require the warnings to be in any language beside English.... The Labeling Act provides that no additional warnings are required on cigarette packages, and we find that this includes warnings in Spanish.

Id. at 117.

In an opinion affirming the Cruz-Vargas case on other grounds, the First Circuit stated, with regard to the failure-to-warn claim in Spanish claim, that "the argument regarding the language of warnings is best entertained by Congress, and not the Courts." Cruz Vargas v. R.J.Reynolds Tobacco Co., 348 F.3d 271, 280 fn.11 (1st Cir. 2003). Therefore, plaintiffs' failure to warn claims for the period after 1969 fail.

CIVIL 02-2707CCC                                    5

PLAINTIFFS' REMAINING STATE CLAIMS

Plaintiffs' remaining claims under Article 1802 of the Civil Code of Puerto Rico, 31 L.P.R.A. §5141, are based on strict liability and/or negligence in the design and manufacture throughout the entire period that their brother smoked cigarettes, as well as the strict liability for failure-to-warn claims which pertain to the pre-1969 period. They allege that defendant is subject to strict liability because it "manufactured, sold and distributed unsafe and defective tobacco products, mainly cigarettes containing ingredients harmful to human life . . .," and that Reynolds was negligent in that it breached its duty of reasonable care to the decedent by failing to design, test, manufacture and sell products that were not addictive or that did not contain unreasonable levels of nicotine and other substances hazardous to health.

CONFLICT PREEMPTION

The doctrine of conflict preemption prevents the application of state laws in a manner conflicting with federal statutes. FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 121 (2000). Conflict preemption occurs where "a federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively or when state law is in actual conflict with federal law." Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995). Congress has foreclosed the removal of cigarettes and other tobacco products from the market. Prado Alvarez v. R.J. Reynolds Tobacco Company, 313 F. Supp. 2d 61, 72 (D.P.R. 2004), aff'd, 405 F.3d 36 (1st Cir. 2005); FDA, 529 U.S. at 121 ("Congress' express policy is to protect commerce and the national economy while informing consumers about any adverse health effects"); 15 U.S.C. §1331 (1998 & Supp. 2004). "[A]llowing tort actions against cigarette manufacturers and sellers for the allegedly negligent act of continuing to make and sell cigarettes would interfere with Congress' policy in favor of keeping cigarettes on the market." Cruz Vargas 218 F. Supp. 2d at 118 (quoting Insolia v. Philip Morris Inc., 128 F. Supp. 2d 1220, 1224 (W.D. Wis. 2000)).

CIVIL 02-2707CCC                                       6

Pursuant to the doctrine of conflict preemption Reynolds cannot be held liable under Article 1802 for the manufacture and sale of cigarettes after the passage of the Labeling Act. Prado Alvarez, 313 F. Supp. 2d at 72-73.  Plaintiffs' claims premised on manufacturing and marketing an inherently dangerous product after 1969 also fail.

COMMON KNOWLEDGE PRIOR TO 1969

According to the facts alleged in the complaint, the decedent began smoking "only Winston"[4] in about 1953. In order to succeed on their pre-1969 failure-to-warn claims, plaintiffs must show that ordinary consumers were unaware of smoking dangers when the decedent became a smoker in 1953 or 1954.  Prado Alvarez v. R.J. Reynolds Tobacco Company, 405 F.3d. 36, 38-39(1st Cir. 2005); De Jesús Rivera v. R.J.Reynolds Tobacco, Company. 368 F. Supp. 2d 148, 152 (D. Puerto Rico 2005).  A manufacturer cannot be held liable under either strict liability or negligence for failure to warn of a danger commonly known to the public.  Cruz Vargas, 348 F.3d, at 275.

Plaintiffs contend that Reynolds is strictly liable for the decedent's alleged cigarette-related death because it failed to include warnings about the health hazards of their cigarettes at the time he started to smoke cigarettes in the 1950s.  Reynolds responds that it was not required to provide warnings prior to the passage of the Labeling Act because the health hazards and habituating effects of cigarettes were commonly known to the general public in Puerto Rico at the time decedent began to smoke and/or there is no evidence that Reynolds' alleged failure to warn proximately caused his injuries.

---

[4]There is evidence elsewhere in the record that decedent smoked Salem, Chesterfield, and Camel cigarettes at various times.

CIVIL 02-2707CCC                                        7

The role of common knowledge[5] in determining the liability of the cigarette manufacturers to consumers in Puerto Rico for alleged damages caused by smoking was recently addressed by the Court of Appeals for the First Circuit in their decision in Prado Alvarez, 405 F.3d. at 38, the Court stated:

> [plaintiffs] may not prevail on either the common law failure to warn or the design defects claims unless they can show that the ordinary consumer was unaware of the dangers of smoking.  A manufacturer cannot be held liable under either strict liability or negligence for failure to warn of a danger commonly known to the public.  A manufacturer need not warn of a hazard if the average consumer ordinarily has knowledge of the dangers of the product . . . a product is only defective if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.

(Citations Omitted.)
Both parties have sought to establish their position on common knowledge before 1969 through expert evidence.  "[The court] noted that the 'common knowledge' defense is assessed objectively and, 'despite the nomenclature, it is a technical question involving methods, financing, and sources of research beyond the competence of lay determination, at least when pertaining to history forty or fifty years removed from the time of trial.'"  Prado Alvarez, 405 F.3d., at 39-40 citing Cruz Vargas, 348 F.3d. at 273.

Plaintiff's expert, Dr Luis E. Díaz-Hernández, holds a Ph.D. in history from the University of Navarro in Spain.  He has worked for the past twenty-five years at the Pontifical Catholic University in Ponce, Puerto Rico, in its Department of History, Fine Arts and Music, first as a professor and since 2003 as department chairman.  This was his first investigation related to tobacco use and his first experience as an expert witness in a court proceeding.

---

[5]We will use the phrase "common knowledge" to refer to the knowledge possessed by the ordinary consumer in Puerto Rico and/or New York, as applicable, about the health hazards of cigarettes and tobacco use.

CIVIL 02-2707CCC                                        8

In his amended report,[6] (Plaintiffs' Ex. L) Díaz states that his research consisted of exploring newspapers, advertisements and documents published in local newspapers since the 1930's, and interviews with "several" individuals who could provide information on the issue of the common knowledge of the Puerto Rican people, between 1930 and 1969, about the health damages related to tobacco use.  Díaz breaks the object of his investigation into determining "three main thematic pointers," which may be summarized as: what was the common knowledge of Puerto Rican consumers about the hazards of tobacco use and its addictive nature between 1930 and 1969.  For plaintiffs to prevail at this juncture on the failure-to-warn issue, Díaz' report had to create an issue of material fact as to whether the ordinary consumer was aware of the dangers of smoking during the period.

Although Díaz correctly defines the parameters of the subject, his report reflects that the focus of his investigation was very limited.  The findings are not responsive to the question of what the common knowledge was prior to 1969.  Instead, Díaz based his conclusions on information disseminated by a few specific sources and not what the public commonly knew from all available sources.  At page three of the amended report the summary of his findings demonstrates that, although the goal of his research was correct as initially stated, his definition of what could be considered as "common knowledge" was limited to governmental information:

>  Regarding the topics at issue, my findings reveal that before 1969, <u>there was not an official, Puerto Rican educational, government directive linked to the tobacco use</u>.  The earliest evidence of official warning from the public Health, Federal or State government was in 1965....

(Our emphasis.)

---

[6]Reynolds has moved the Court in two very extensive motions to strike both Dr. Diaz' original report (**docket entry 59**) and the amended report, (**docket entry 71**) alleging that the witness does not qualify as an expert, that his investigation and his report do not conform to the standards required by Fed.R.Civ.P. 26(a)(2) and are insufficient and untimely.  For the purposes of this motion, the Court has considered that report in this decision.

CIVIL 02-2707CCC                                    9

To further support his findings he cites only two interviews with unidentified persons, the first one is the son of an accountant who stated that his father "<u>never received any warning verbal or otherwise by any local or federal agency</u> regarding the dangers of smoking, with the exception of the 1965 warning." (Our emphasis.) The second interview was with a doctor who was a heavy smoker who stated "that there were scientific studies published in specialized journals of Medicine of Science, and small local research papers by the League Against Cancer warning about the possible relation of tobacco consumption being a habit rather than an addiction," but that "this kind of information was not at hand to the public at large so its impact was close to nil within the general population." (<u>Id</u>. at 3-4).

> Díaz further demonstrates the serious limitations in the scope of his investigation:
>
> Regarding the island of Puerto Rico, <u>there is no evidence whatsoever of an "official campaign by any government agency</u> informing, inviting, or advising the general population to: a) stop smoking, b) of addiction and health risks due to smoke inhalation (second hand smokers) or any other physical condition or, c) and smoking restriction in public places (Exhibit). <u>If there was an official governmental directive in this area, there is not evidence that such was known, advised or enforced at the local government</u>.

<u>Id</u>. at 4 (Our emphasis.)

Díaz' amended report demonstrates that his investigation did not address the issue of what was the level of the public's awareness in Puerto Rico about the hazards of cigarette smoking prior to 1969, and instead focuses only on what knowledge was available from governmental sources. Moreover, Díaz' five-page amended report contains no citations to or identification of specific sources used to form his conclusions. While the word "exhibit" appears in parentheses in several places, they are neither identified nor attached to the report.[7] Attached at the end, with no reference, are what appears to be a page from the Congressional Record and a list of celebrities who allegedly died from smoking related illnesses.

---

[7] The weaknesses in Dr. Díaz' investigation and report are also noted in <u>Ramos v. R.J.Reynolds Tobacco Co.,Inc.</u>, Civ. 02-2707, Opinion dated August 26, 2005 and <u>De Jesús Rivera v. R.J.Reynolds Tobacco, Inc.</u>, <u>supra</u>.

CIVIL 02-2707CCC                              10

We turn to the Reynolds' expert's evidence on the issue under discussion. Dr. Luis Martínez-Fernández' qualifications are extensive;[8] we note here only that some of the undergraduate and graduate level courses devoted to social history that he has taught over the past twenty-one years have addressed the role of tobacco in Caribbean and Latin American culture, economy and society. The report resulting from his investigation on the issue of common knowledge (defendants's Ex. 30) was cited with approval by the Circuit Court in Prado Alvarez, 405 F.3d. supra, at 42-43, when it determined that Martínez' report was sufficient to establish that the cigarette manufacturer had no duty to warn consumers of risks and the addictive nature of cigarettes because these dangers had been common knowledge in Puerto Rico in 1960, the year in which the decedent in that case began to smoke. His exposition of the information available in Puerto Rico began with citations to two articles in La Salud: Seminario de Hygiene, published in 1883, and other articles published in 1912, 1928, and1932.[9] Martínez provided over 100 footnotes, some containing multiple citations to specific articles and other sources directed to the dangers of smoking. The materials available to the general public during the 1940s, 1950s and early 1960s directly from magazines in ths Spanish language and indirectly through their doctors and other health care professionals was extensive. He cites articles published Selecciones del Reader's Digest, Alma Latina and El Mundo, during this period relating tobacco use to lung cancer and heart disease and which

---

[8]Dr. Martínez has appeared as the expert witness on the issue of common knowledge of the health hazards of tobacco in several of tobacco cases that have been filed in this court. His credentials are extensively discussed in Prado Alvarez, 405 F.3d. at 40-41, as are the details of his investigation and methodology, at 41-43.

[9]The 1932 article from the Bulletin of the Medical Association of Puerto Rico included this comment about tobacco: "The chemical and mechanical irritant actions of these agents, particularly tobacco, on the epithelium in the bronchi and the pulmonary alveoli stimulate and encourage metaplasia and neoplastic proliferation by repeated stimulation." While this type of article was not directly disseminated to the public in general, doctors would have been able to advise their patients on the connection between smoking and lung cancer.

CIVIL 02-2707CCC                                      11

point out the difficulty in quitting the habit.  Martínez cites articles in the <u>Puerto Rico Evangélico</u>, published between 1912 and 1954, promoting that religious community's anti-smoking efforts.  Other religious publications that warned of the dangers of smoking during the period in question include <u>El Piloto</u>, <u>El Centinela</u> and <u>Atalaya</u>.  Also playing an important role in disseminating information during the 1940s was the Puerto Rico Anti-Cancer League which published many articles about the carcinogenic nature of tobacco.

Martínez cites Gallup polls taken between 1949 through 1959 which demonstrate that the general public was aware that smoking cigarettes was associated with disease.  Poll data collected in Puerto Rico during 1964 showed that most people polled believed that smoking was the primary cause of cancer.

Because José Luis Nieves-Rodríguez lived in New York from approximately the mid 1950s through part of the 1960s, Dr. Martínez also addressed the common knowledge about cigarettes' health hazards in New York.  He concluded by saying:

> The sources and evidence highlighted in this affidavit indicate the variety of ways in which Puerto Ricans have come to understand both generally that smoking is hazardous to health, as well as the specific health hazards, including cancer, associated with smoking.  Based on a thorough and careful review of that large body of evidence, it is my firm professional opinion that during the entire period of Mr. José Luis Nieves Rodríguez' lifetime, there was a broad and increasing public awareness of the health hazards of smoking, including an awareness of the specific hazards of cancer, and widespread awareness that cigarette smoking was a "habit" or an "addiction" or a practice that proved difficult for many people to quit.

Martínez Affidavit at 31-32.

Plaintiffs proffered no evidence on the issue of common knowledge in New York during the relevant period.  Given the limited scope of plaintiff's expert's research and report, in contrast to that of the  defendant's expert, no reasonable jury, confined to the record before us, could conclude that the serious health risks caused by smoking cigarettes, including lung cancer, and the difficulty in breaking the cigarette habit, were not common knowledge to the general public in Puerto Rico and New York by the time José Luis Nieves-Rodríguez  began to

CIVIL 02-2707CCC                                12

smoke in the early 1950s.  We conclude, as the court did in <u>Prado Alvarez</u>, <u>supra</u>, that a reasonable juror could not reject Martínez' detailed and comprehensive report in favor of Díaz' narrowly focused and unsupported conclusions.  Therefore, plaintiffs' claims for strict liability for sale of a dangerous and unsafe product based on Reynolds' failure to provide warnings about cigarettes prior to the implementation of the Labeling Act do not survive the motion for summary judgment.

DESIGN DEFECT

We must also examine plaintiffs averments that defendant is liable for defective design of its cigarettes.  In order to prove their claim of negligence in that the design of defendant's cigarettes was defective, the plaintiffs must establish that (1) defendant owed a duty to prevent the harm by conforming to a reasonable standard of conduct, (2) defendant breached that duty through a negligent act or omission, and (3) that the negligent act or omission caused plaintiff's harm."  <u>Cruz Vargas</u>, 218 F. Supp. 2d., at 118.  Plaintiffs bear the burden of establishing the applicable standard of care, and of proving that PM USA acted below that standard.  <u>Prado Alvarez</u>, 313 F. Supp. 2d at 73.

In support of it request for dismissal of the claim based on alleged design defects, Reynolds submitted the declaration of its Vice President for Product Development, Dr. Jeffrey Gentry (Ex.13).  Dr. Gentry, who began his career with Reynolds as a research and development chemist in 1986, stated that "there is no safe or risk-free cigarette," and that "tobacco and cigarette smoke naturally contain nicotine."  He discussed at length Reynolds' research and development in the field of cigarette design.  He addressed the company's efforts and results in reducing nicotine and tar in its cigarettes, while developing a product that is still acceptable to the smoking public.  After addressing the plaintiffs' allegations regarding design defects, Dr. Gentry stated, at paragraph 47:

> At all points in time of at least the last 60 years, cigarettes manufactured by Reynolds not only conformed to the generally-recognized state of the art, but in many instances established the state of the art in cigarette design.  No entity here

CIVIL 02-2707CCC                                    13

or abroad, whether it be a governmental agency, academic institution or otherwise outside the tobacco industry, has developed a feasible alternative design for cigarettes that is superior to the designs developed and marketed by Reynolds.

Although plaintiffs submitted as exhibits articles[10] of questionable admissibility on cigarette design and composition, and governmental reports, some of which are illegible, they have offered no analysis of them in terms of the criteria for finding Reynold liable for the defective design of its cigarettes. Plaintiffs' only proffer on a design defect as a link in the chain of the causal relationship is contained in the affidavit of their proposed expert witness, pathologist Dr. Angel Román-Franco, which they seek leave to file.[11] His report (Plaintiffs' opposition, Ex. T), is a general exposition of smoking hazards, dangers, and statistics regarding comparisons between smokers and nonsmokers for various diseases from which he concludes that "it is quite accurate to attribute the genesis and evolution of the laryngeal carcinoma the patient developed to the exposure to tobacco derived carcinogens." (Id. at 5.) In his affidavit,[12] Dr. Román-Franco states that he is "of the opinion to a reasonable degree of medical certainty that José Luis Nieves-Rodríguez (sic) illness and death were caused by the design and addictiveness of cigarettes, which delivered nicotine and other carcinogens directly to his lungs." The affidavit, in which for the first time Dr. Román-Franco raises the issue of cigarette design and addiction, does not include any reference or citation to the sources from which he drew his

---

[10] See, e. g. plaintiff's Exhibit AL– Joint Memorandum By Action on Smoking and Health (ASH) and the Royal College of Nursing; and Exhibit AM–The safer cigarette: what the tobacco industry could do and why it hasn't done it–both articles from the United Kingdom.

[11] (Docket entry 62). Defendant has opposed the motion for leave to file the affidavit (Docket entry 66), for reasons of its excessive untimeliness as well as Dr. Román-Franco's admitted lack of expertise.

[12] Plaintiffs did not include the affidavit with the exhibits to their opposition. It may be found as an attachment to their motion for leave to file, docket entry 62.

conclusions.  In the excerpts from Dr. Román-Francos' depositions in this and similar cases,[13] he stated that his area of expertise is in pathology and immunopathology and that he is not an expert on either cigarette design or addiction.

In performing its gate-keeping function of assessing proffered expert evidence, a court must consider "whether the putative expert is qualified by knowledge, skill, experience, training or education." Prado Alvarez, 405 F.3d. at 40.  "Although expert testimony may be more inferential than that of fact witnesses, in order to defeat a motion for summary judgment, an expert opinion must be more than a conclusory assertion about ultimate legal issues." Hayes v. Douglas Dynamics, Inc., 8 F.3d. 88, 92 (1st Cir.,1993) (testimony is insufficient where an expert presents nothing but conclusions–no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected).  See also, Daubert v. Merrill Dow Pharms., Inc., 509 U.S. 579, 592 (1993) ("relaxation of the usual requirement of first-hand knowledge . . . is premised on an assumption the expert's opinion will have a reliable basis in the knowledge and experience of his discipline").  We find that Dr. Román-Franco, although a specialist in the field of pathology, does not qualify for consideration as an expert for the purpose of presenting conclusions about the  the design or addictiveness of cigarettes.  Aside from the untimeliness of the production of the affidavit, Dr. Román-Franco's admission that he does not have any expertise on these subjects precludes the admissibility of his report and his testimony[14] for this purpose.

---

[13] Defendant's opposition docket entry 66, Exhibits 1, 2, and 3.

[14] We do not enter into the merits of his expertise on the matter of the causation of the decedent's illness, as it is not necessary for the resolution of this motion.  We note, however, that the report and affidavit are generic, and differ from his reports in other tobacco cases before this Court by the substitution of the case title, smoker's name, personal information and type of illness.

CIVIL 02-2707CCC                                           15

## PROXIMATE CAUSE

We find, moreover, that Plaintiffs' evidence also falls short of demonstrating the requisite causal connection between either a failure-to-warn or design-defect and Decedent's injuries. We note that plaintiffs have litigated this case as if it were a class action. If is rife with arguments and generalities about smokers, smoking, health hazards, addiction and the tobacco industry, and contains very few substantive facts about the decedent's own, personal experience as a smoker. The plaintiffs' deposition testimony, as discussed below, which was submitted by Reynolds in support of its motion, demonstrates that they know very little about it. In fact, the only exhibit submitted by plaintiffs to support their opposition that is unique to this case is their brother's death certificate.

Víctor Rodríguez, who was five years younger than the decedent testified at his deposition that his brother began smoking at about 16 or 17 year of age (defendant's Ex.1 at 137). He expressed that he really didn't know why his brother stated smoking. (Id.) He stated that the decedent smoked about at least one or two packs a day when he was in the metropolitan area and "worse" in his own town. (Id. at 149). Víctor emphasized that his brother smoked all the time. He stated that the only time José stopped smoking was after he fractured his hip. (Id. at 159.) Víctor knew of no attempts made by the decedent to stop smoking, or a desire to do so.

The plaintiff testified that his brother was well-read from an early age (Id. at 163-167); that the decedent read a lot of newspapers including El Día, El Mundo, El Imparcial and Reader's Digest. (Id.) He had no idea whether decedent had ever read articles about the hazards of smoking and Víctor, personally, knew very little about it because he himself didn't smoke (Id.) Víctor stated that his brother understood quite a bit of English and could also read and write it. (Id. at 186.) He had no knowledge about whether his brother believed the warnings on the cigarette packages as they had never discussed it. (Id. at 187.) He had no knowledge about whether anyone had ever suggested to decedent that he quit smoking. (Id.

CIVIL 02-2707CCC                                          16

at 189.)  He did not even know until he was told at the deposition that his brother had missed six months of work due to cirrhosis of the liver.  (Id. at 192,195-196.)  In sum, plaintiff Víctor Nieves-Rodríguez had very little knowledge about the decedent's smoking habit or his health in general.

His sister, co-plaintiff Blanca Nieves, who is younger than Víctor, also had very little knowledge of her brother's smoking habits or knowledge of the harmful effects.  She testified at her deposition (defendant's Ex. 2) that she never discussed the subject of her brother's smoking with her mother or the decedent, or thought about the risks until he was already in the hospital.  (Id. at 85-87.)  Before that she only knew that smoking could cause hoarseness or a cough.  (Id. at 88.)  She believed that advertisements in the movie theaters caused her brother to start smoking because he went to the movies and he continued to smoke every day, more and more (Id. at 104).  She could not say whether he would not have smoked if he hadn't gone to the theater, and admitted that they never discussed it.  (Id. at 104-105.)

Other persons provided more information.  Decedent's neighbor Nydia Pérez-Caballero testified at her deposition (defendant's Ex. 31) that she knew José Nieves-Rodríguez for about thirty-eight years as a neighbor in Barceloneta (Id. at 12), and that he was like a blood relative to her (Id. at 20).  She stated that she began telling him to stop smoking "years ago;" (Id. at 52) that she always told him to stop smoking but he just shrugged his shoulders (Id. at 49).  There came a time when he was really hoarse and she told him that it had to do with the cigarettes.  (Id.)  She did not know of any attempts on his part to stop smoking, nor did he ever cut back.  (Id. at 55.)  Ms. Pérez believed that the decedent knew the dangers of smoking because of the warnings on the packages and because he read the newspapers and watched all the news reports.  (Id. at 59-60).

Awilda Torres-Cubano testified at her deposition that she was born in Barceloneta and has lived there all her life.  (Defendant's Ex.32 at 4).  She knew the Nieves-Rodríguez family, stating that decedent stayed in Barceloneta  because he had a job there when his mother and

CIVIL 02-2707CCC                                            17

the rest of the family moved to San Juan. (Id. at 14)  She was the person who took José Nieves-Rodríguez to the doctor and to the hospital at the time his cancer was discovered. (Id. at 10). Torres-Cubano stated that José's health was generally fine, except that at one time he had hepatitis. (Id. at 17). A long while before he was diagnosed with cancer, he was having trouble with his throat and difficulty breathing. Torres-Cubano offered several times to take him to the doctor, but he refused. (Id. at 28.) At the time he finally went to the hospital he was still smoking (Id. at 31). She stated that she made comments to José that he should quit smoking. She told him that it was because smoking was harmful to his health; that he should just stop and see if his health improved. (Id. at 36-37.) He would just respond, "Yeah, yeah, I'll do it." (Id. at 37.) Torres-Cubano also described him as an intelligent man who read whatever newspapers he could find, magazines and watched all of the evening news programs on television. (Id. at 37-38.) She also stated that José smoked two to three packs of cigarettes a day. (Id. at 41.) She would tell him "Joe, you're smoking too much," and he would just laugh. (Id. at 42.)

Bienvenido Rivera-Rodríguez, a cousin of plaintiffs and the decedent, was also deposed. (Defendant's Ex. 33.)  He knew José his entire life and believed that the decedent left for the United States around 1959 or 1960 and returned before 1967.  (9) He believed that José understood English and stated that his cousin read publications in English.  10) He admitted that around 1986 he had told his cousin about the effects of smoking and at some point told him to quit "cold turkey."  (34) Rivera confirmed that the decedent smoked two to three packs a day.  (21) He stated that you could not approach the topic of quitting smoking with José because he would evade the subject or leave (14-15, 22-23). Rivera, too, confirmed that his cousin was well-read (23-24).

Blanca Nieves speculated that her brother was influenced to start smoking or continue to smoke by advertisements he saw in the movie theaters, because he went to the movies often and  smoked more and more.  Even if true, no evidence was proffered that the advertisements

CIVIL 02-2707CCC                                18

were for Winstons or any other brand manufactured by Reynolds.  The testimony of José's friends and his cousin reveal that he was warned about the dangers of smoking, but he paid no attention and, in fact, made it clear that he didn't want to talk about the subject.  Víctor and the witnesses agreed that the decedent was intelligent, regularly watched a variety of news programs on television and regularly read newspapers and magazines in both Spanish and English.  Thus, on the record before us, it appears that the verbal warnings from friends and his cousin as well as those implemented pursuant to the Labeling Act were irrelevant to the decedent's decisions about smoking.  See, Prado-Alvarez, supra at 42, citing Estate of White v. R.J.Reynolds Tobacco Co., 109 F. Supp. 2d 424, 435 (D. Md. 2000) (proof that decedent ignored verbal warnings and warnings on cigarette packages shows lack of proximate cause for decedent's cigarette related injuries).

       We additionally note that neither defendant nor plaintiffs addressed the fifth count of the complaint, which alleges a breach of unidentified Puerto Rico law by the mere fact of non-compliance with federal law.  We, therefore, dismiss this claim without prejudice, *sua sponte*.  See, HMG Property Investor, Inc. v. Parque Industrial Río Canas,Inc., 847 F2d. 908, 916 (1st Cir. 1988) (a federal court may dismiss claims *sua sponte* for proper cause.)

       For the above stated reasons, defendant's Motion for Summary Judgment (**docket entry 36**) is GRANTED, and this action is DISMISSED.

       SO ORDERED.

       At San Juan, Puerto Rico, on September 23, 2005.

                                               S/CARMEN CONSUELO CEREZO
                                               United States District Judge